UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

DANA H.,[1]
                                    Plaintiff            DECISION and ORDER

-vs-                                                     6:20-CV-6592 CJS

COMMISSIONER OF SOCIAL
SECURITY,
                                    Defendant.
_____

## INTRODUCTION

This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final determination

of the Commissioner of Social Security ("Commissioner" or "Defendant") which denied the

application of Plaintiff for Supplemental Security Income ("SSI") benefits.   Now before the Court

is Plaintiff's motion (ECF No. 16) for judgment on the pleadings and Defendant's cross-motion

(ECF No. 19) for the same relief.   For the reasons discussed below, Plaintiff's application is

denied and Defendant's application is granted.

## STANDARDS OF LAW

The Commissioner decides applications for SSDI benefits using a five-step sequential

evaluation:

> A five-step sequential analysis is used to evaluate disability claims. *See* 20 C.F.R.
> §§ 404.1520, 416.920.   First, the Commissioner considers whether the claimant
> is currently engaged in substantial gainful activity. If he is not, the Commissioner
> next considers whether the claimant has a severe impairment which significantly
> limits his physical or mental ability to do basic work activities. If the claimant suffers

_____

[1]  The Court's Standing Order issued on November 18, 2020, indicates in pertinent part that, "[e]ffective
immediately, in opinions filed pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), in the
United States District Court for the Western District of New York, any non-government party will be identified and
referenced solely by first name and last initial."

such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in the regulations [or medically equals a listed impairment].    Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity [("RFC")] to perform his past work.[2]  Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform. The claimant bears the burden of proof as to the first four steps, while the Commissioner bears the burden at step five.

*Colvin v. Berryhill*, 734 F. App'x 756, 758 (2d Cir. 2018) (citations and internal quotation marks omitted)

An unsuccessful claimant may bring an action in federal district court to challenge the Commissioner's denial of the disability claim.    In such an action, "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C.A. § 405(g) (West).    Further, Section 405(g) states, in relevant part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive."

The issue to be determined by the court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998); *see also, Barnaby v. Berryhill*, 773 F. App'x 642, 643 (2d Cir. 2019) ("[We] will uphold the decision if it is supported by substantial evidence and the correct legal standards were applied.") (citing *Zabala v. Astrue*, 595 F.3d 402,

---

[2] Residual functional capacity or RFC "is what the claimant can still do despite the limitations imposed by his impairment." *Bushey v. Berryhill*, 739 F. App'x 668, 670–71 (2d Cir. 2018) (citations omitted); *see also*, 1996 WL 374184, Titles II & Xvi: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8P (S.S.A. July 2, 1996).

408 (2d Cir. 2010) and *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012).").

"First, the [c]ourt reviews the Commissioner's decision to determine whether the Commissioner applied the correct legal standard." *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999). However, not every legal error by an ALJ requires reversal. Rather, an error may be deemed harmless unless it prejudices the plaintiff by negatively affecting the outcome of the ALJ's decision. See*, Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) ("[W]here an error of law has been made that might have affected the disposition of the case, this court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ. Failure to apply the correct legal standards is grounds for reversal.") (citation omitted).[3]

If the Commissioner applied the correct legal standards, or if any legal error was harmless, the court next "examines the record to determine if the Commissioner's conclusions are supported by substantial evidence." *Tejada v. Apfel*, 167 F.3d at 773. Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. (citation omitted).

The substantial evidence standard is a very deferential standard of review—even more so than the 'clearly erroneous' standard, and the Commissioner's findings of fact must be upheld unless a reasonable factfinder would have to conclude

---

[3] *See also, Monroe v. Comm'r of Soc. Sec.*, 676 F. App'x 5, 9 (2d Cir. 2017) ("[W]e agree that any such error was harmless, since Monroe has not identified any prejudice and the record establishes that the error did not affect the ALJ's decision."); *Suttles v. Colvin*, 654 F. App'x 44, 47 (2d Cir. 2016) ("[A]ssuming that the Appeals Council erred, there was nevertheless no reasonable possibility that consideration of Dr. Liotta's report would have altered the ALJ's decision, because the evidence that Dr. Liotta adduced was not materially different from that which was already before the ALJ and the vocational expert when they reached their conclusions."); *but compare, Greek v. Colvin*, 802 F.3d 370, 376 (2d Cir. 2015) ("Dr. Wheeler provided the ALJ with an opinion that Greek . . . would likely be absent from work more than four days per month as a result of his impairments or treatment.  . . . Because a vocational expert in this case testified that Greek could perform no jobs available in large numbers in the national economy if he had to miss four or more days of work per month, the ALJ's failure to provide adequate reasons for rejecting Dr. Wheeler's opinion was not harmless.").

otherwise." *Brault v. Social Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam) (emphasis in original). "An ALJ is not required to discuss every piece of evidence submitted, and the failure to cite specific evidence does not indicate that such evidence was not considered." *Id*.

*Banyai v. Berryhill*, 767 F. App'x 176, 177 (2d Cir. 2019), as amended (Apr. 30, 2019) (internal quotation marks omitted).

In applying the substantial-evidence standard, a court is not permitted to re-weigh the evidence. *See, Krull v. Colvin*, 669 F. App'x 31, 32 (2d Cir. 2016) ("Krull's disagreement is with the ALJ's weighing of the evidence, but the deferential standard of review prevents us from reweighing it."); *see also, Riordan v. Barnhart*, No. 06 CIV 4773 AKH, 2007 WL 1406649, at *4 (S.D.N.Y. May 8, 2007) ("The court does not engage in a *de novo* determination of whether or not the claimant is disabled, but instead determines whether correct legal standards were applied and whether substantial evidence supports the decision of the Commissioner.") (citations omitted).

FACTUAL and PROCEDURAL BACKGROUND

The reader is presumed to be familiar with the facts and procedural history of this action. The Court will refer to the record only as necessary for purposes of this Decision and Order.

Plaintiff has a high school education.    Plaintiff was in special education classes throughout his school years.    Plaintiff indicates that while in school he was anxious and bullied by some peers, though this situation improved when he began using and distributing marijuana. In or about his junior year of high school Plaintiff was assaulted by a classmate who struck him with a tree branch, causing a skull fracture and traumatic brain injury. Tr. 451 ("He was seen at Strong [Memorial Hospital] for about 2 weeks.    He lost consciousness.    He had a [right] parietal

4

depressed skull f[racture], underlying contusions[.]").

In or about his senior year of high school, Plaintiff began attending a program at the Board of Cooperative Educational Services ("BOCES").   In that regard, a report from Plaintiff's high school's Committee on Special Education ("CSE"), recommending that he attend the BOCES program, observed that his reading comprehension skills were "at or above grade level" but his math skills were "not as well developed." Tr. 216, 451.   Additionally, the CSE noted that the BOCES program might be beneficial to Plaintiff since he had a detached attitude toward his regular classes and peers, and would often leave school early. Tr. 216.   At BOCES, Plaintiff attended a work-study program that placed him at an outside business with a job coach in connection with New York's VESID (Vocational and Educational Services for Individuals with Disabilities) program. Tr. 216, 218.   Plaintiff initially performed well at the work-study program, but became "bored" and "difficult to manage" after he realized that the program would not result in long-term employment with that company, and was fired. Tr. 219.   Plaintiff subsequently held approximately thirteen-to-sixteen different jobs, but was fired from every one of them. Tr. 451 ("Has had 16 jobs since 1995 and has been let go from all of them.").   Plaintiff indicates that when being fired, he was typically told that he was "too slow" or "not a good fit" for the job. Tr. 274.

Plaintiff's use of marijuana, which, as noted earlier, began in high school, continued through his adult life.   Plaintiff also abused prescription narcotics, and then heroin, though he has reportedly not used heroin since 2002. Tr. 682 (Office note summarizing Plaintiff's drug-use history).   At all times relevant to this action, the record suggests that Plaintiff's days have, to

some extent, revolved around his drug usage.[4]   For example, medical and mental health treatment notes reference Plaintiff's daily visits to a methadone clinic, daily heavy usage of marijuana, and daily usage of non-prescribed klonopin.   Plaintiff justifies his use of marijuana and klonopin as being necessary to cope with his anxiety. *See, e.g.*, Tr. 384, 453, 461, 464, 478, 488, 680.   Indeed, Plaintiff has opted to switch recovery programs rather than comply with demands by treatment providers that he stop using non-prescription benzodiazepines. Tr. 680, 682.   Plaintiff also smokes a pack of cigarettes per day. Tr. 451, 617.

Plaintiff has a variety of physical health problems including obesity, diabetes, hypertension and hyperlipidemia.   Treatment notes from office visits for those conditions generally indicate normal mental status findings. *See, e.g.*, Tr. 380 (Alert, oriented, appropriate mood and affect); 399 ("Cooperative, appropriate mood & affect."); 511 ("Psychiatric: He has a normal mood and affect.   Thought content normal."); 532 ("His behavior is normal."); 573 ("Judgment and thought content normal.   He is not actively hallucinating.   Cognition and memory are normal.   He is attentive."); 617 ("Normal mood and affect.").

In 2017 Plaintiff's mother sought to have him evaluated for disability benefits. Tr. 570 ("The patient's mother is concerned that the patient sustained a TBI in '95 from a result of an assault at age 17 when he was hit in the head with a tree [branch].   The patient's mother's concerns are that the patient has not been able to keep a job and she feels this is related to his TBI.   She is requesting a referral to a neurologist for a re-evaluation.").

---

[4]  *See, e.g.*, Tr. 255 ("I get dressed and driven to Strong Recovery for my methadone dose (6 days/week.").   The Court recalls seeing a treatment note indicating that Plaintiff eventually began attending the methadone clinic just once per week, where he was given a week's supply of methadone.

On October 9, 2017, neurologist Mary Lynne Dombovy, M.D. ("Dombovy") examined Plaintiff and noted, "Seems a bit slow; memory mildly impaired. Poor eye contact.   Behavior a bit delayed.' Tr. 453.   Dombovy reported that Plaintiff was complaining of impaired memory, anxiety, panic attacks and insomnia. Tr. 451, 453.   Dombovy further stated:

> He has sustained a significant TBI.   He seems slowed and has some memory deficits on clinical exam.   As there is some premorbid [(pre-injury)] cognitive and behavioral issues, neuropsychological testing is needed to clarify diagnosis, prognosis and will serve to guide medical management.

Tr. 455.

In January 2018, neuropsychologist Krista Damann, Ph.D. ("Damann") evaluated Plaintiff upon referral from Dombovy.   Damann evaluated Plaintiff over the course of two sessions, since Plaintiff indicated that he became fatigued during the first session. Tr. 439 ("He states, 'Four hours?   I can't do anything for 4 hours.'").   Plaintiff, who was then 39 years of age, reported a history of "cognitive and emotional changes in the context of remote TBI, premorbid learning disability/ADHD, substance abuse, depression and anxiety." Tr. 434.   Plaintiff complained of the following symptoms: short-term memory problems; difficulty concentrating; panic and anxiety; low mood; and irritability. Tr. 435-436.   Plaintiff indicated that his mother prepared his medications and reminded him to take them, made his medical appointments, financially supported him and took care of the house. Tr. 436.   Plaintiff indicated that took care of "the outside tasks around the house" and "spen[t] a lot of time playing video games." Tr. 436.

Plaintiff told Damann that he had been taking methadone for fifteen years and that he used marijuana daily for anxiety. Tr. 438. Plaintiff also stated that his methadone treatment clinic had required him to wean himself from Klonopin, but that he was still using Klonopin without a

prescription. Tr. 438.

Damann administered a battery of tests, and reported the following findings, in pertinent part: Plaintiff's pre-injury functioning was in the low average range; his IQ was in the low average range; his math functioning was in the low average range, and his reading fluency was more impaired; he exhibited signs of depression and anxiety; he experienced significant negative consequences from his use of drugs; he had problematic personality traits; and he was unusually concerned about his physical health despite not pursuing a healthy lifestyle.    Damann's diagnoses included diffuse traumatic brain injury with loss of consciousness of unspecified duration, mild neurocognitive disorder due to traumatic brain injury, learning disabilities, major depressive disorder, recurrent, moderate, anxiety disorder and cannabis abuse. Tr. 446. Regarding Plaintiff's use of marijuana, Damann commented that while Plaintiff believed it helped him to focus and manage anxiety, it was "quite possible that his continued use actually contribute[d] to negative cognitive side effects." Tr. 445.   As for her recommendations, Damann indicated, in pertinent part, that she did not think Plaintiff was employable:

> Mr. [H]'s test results, emotional functioning, and prior work history indicate that he is not appropriate for full-time employment.   He states that he has previously worked with ACCES-VR [(a New York State vocational agency)] and did not find the services to be particularly helpful.   He is a viable candidate for disability benefits related to his learning disability and cognitive deficits due to TBI.

Tr. 446.

Apart from the evidence of his limitations, the record also indicates that Plaintiff appears to have little motivation or actual need to work, since his mother supports him financially, allows him to live with her, and does most of the shopping, cooking and household chores.   Plaintiff and his mother, though, genuinely seem to believe that he is incapable of working, blaming the

traumatic brain injury and citing the fact that he has been fired from every job he has ever had. Tr. 847.

On March 27, 2018, Plaintiff filed the subject application for SSI benefits.   Plaintiff claims to have become disabled on that same date, March 27, 2018, the amended alleged onset date.[5] The Social Security Administration ("SSA") representative who interviewed Plaintiff in connection with his application reported that he appeared to have difficulty with understanding, coherency, concentrating, talking and answering. Tr. 241.

On April 10, 2018, Plaintiff submitted a functional report that was completed largely, if not entirely, by his mother, and signed by Plaintiff. Tr. 255-266, 274.   The report indicates that Plaintiff is capable of performing the following activities: personal care, including dressing, bathing, shaving and feeding himself;[6] driving a car; shopping in a supermarket; traveling independently; taking walks outside; mowing the lawn; caring for his dog;[7] cooking; and performing "small repairs."[8]   Plaintiff indicated that his activities included watching television, playing video games, watching Youtube videos, talking on the phone and occasionally visiting with friends.   Plaintiff indicated that he had no problem getting along with people and had never lost a job due to inability to get along with others. Tr. 260, 262.   Plaintiff stated that he "sle[pt] a lot," depending on his emotional state. Tr. 256.   Plaintiff reported that his mother reminded him

---

[5] ECF No. 16-1 at p. 1.

[6] The report expressly indicated that Plaintiff needed no "help or reminders" to perform his personal care routine. Tr. 256, 257.

[7] Plaintiff later testified that he lets the dog in and out of the house, but that his mother feeds the dog. Tr. 256. This is one of many activities, along with cooking and driving, which Plaintiff appears capable of performing, but does not since his mother usually does it for him.

[8] In one office treatment note, Plaintiff indicated that his father, with whom he does not live, was upset with him because he had used his father's welding equipment while his father was away.

to take his medications each day.[9]   As far as limitations, Plaintiff indicated that his "organizational skills are lacking"; he is not responsible handling money; he has a hard time staying focused on tasks without his mind wandering; and he has "daily" panic attacks and anxiety in response to stress, with the attacks lasting, on average, "4 to 5 min[utes]" Tr. 265.

On May 15, 2018, psychologist Adam Brownfeld, Ph.D. ("Brownfeld") conducted a consultative psychiatric evaluation of Plaintiff at the Commissioner's request. Tr. 693-697. Brownfeld reported that Plaintiff had been in special education classes due to learning disabilities, had suffered a TBI, had lost many jobs and had been seeing a mental health counselor for years. Tr. 693.   Brownfeld noted that Plaintiff was reporting symptoms including anxiety, excessive worry, sad moods, crying spells, loss of usual interest in things, social withdrawal, lack of ambition, loneliness, inability to concentrate and poor memory. Tr. 693-694. Regarding activities of daily living, Plaintiff essentially reported the same activities that had been listed in the functional report completed a month earlier, as discussed above.   Upon examination, Brownfeld reported essentially normal mental-status examination findings including appropriate eye contact, fluent speech, euthymic mood, full affect, good insight, good judgment, and intact attention, concentration and memory. Tr. 694-695.   Brownfeld estimated that Plaintiff's cognitive functioning was in the "low average to borderline range." Tr. 695.   For his medical source statement, Brownfeld indicated that Plaintiff would have the following abilities and limitations: Unlimited ability to understand, remember and apply simple instructions, use reasoning and judgment to make work-related decisions, maintain personal hygiene, be aware

---

[9] At the administrative hearing, Plaintiff indicated that he did not need reminders to take his diabetes medication, since he did not feel well if he forgot to take it.

of normal hazards; moderately limited ability to interact appropriately with others, regulate emotions, control behavior and maintain well-being; and mildly limited ability to sustain concentration, perform tasks at a consistent pace, sustain an ordinary routine, maintain regular attendance at work, and apply complex directions and instructions. Tr. 695-696.

On July 19, 2019, mental health therapist Barbara Bush, LCSW-R ("Bush"), who had been treating Plaintiff for approximately six weeks, completed a mental impairment questionnaire. Tr. 938-942.   Bush's primary diagnoses were "r/o [(rule out)] bipolar disorder, r/o personality disorder." Tr. 938.   Bush stated that Plaintiff was not taking any mental health medications, though presumably he was still using marijuana and non-prescribed klonopin.[10]   Bush indicated that Plaintiff cannot focus, does not take social cues, is constantly preoccupied and worried, cries easily or becomes angry, gets easily agitated dealing with people and does not feel safe leaving home except in the middle of the night.   Bush checked boxes on the form indicating the presence of the "paragraph C" factors used by ALJs at step three of the five-step sequential evaluation to evaluate mental impairments. Tr. 940.   Bush further indicated that Plaintiff would only occasionally be able to exhibit most of the mental abilities needed to do unskilled work, and that he could never work around other persons without being unduly distracted, complete a normal workday or workweek without interruptions from mental health symptoms, perform at a consistent pace, accept instructions and criticism from supervisors, get along with co-workers, interact with the public or maintain socially appropriate behavior. Tr. 941.

On July 24, 2019, a hearing was held before an ALJ, at which Plaintiff appeared with his attorney, and at which Plaintiff, his mother and a vocational expert ("VE") testified.

---

[10]  Bush notes that Plaintiff admitted to using marijuana, but does not mention klonopin. Tr. 942.

On October 10, 2019, the ALJ issued a decision finding that Plaintiff was not disabled at any relevant time.   In pertinent part the ALJ found that Plaintiff had severe mental impairments consisting of traumatic brain injury, major depressive disorder, generalized anxiety disorder, learning disorder, attention-deficit disorder, attention deficit hyperactivity disorder, and mild neurocognitive disorder, in addition to severe physical impairment consisting of obesity and diabetes. Tr. 18.   However, the ALJ further found that such impairments did not meet or medically equal a listed impairment; that Plaintiff had the RFC to perform a full range of work at all exertional levels, provided that it did not involve production-rate work and involves only simple instructions, simple work-related decisions, only occasional changes in routine work setting and only occasional interaction with coworkers and the public, Tr. 20; that Plaintiff had no past relevant work; and that Plaintiff could perform jobs existing in significant numbers in the national economy, Tr. 25.   The ALJ consequently concluded that Plaintiff was not disabled.

In reaching that determination the ALJ discussed the evidence of record and noted that Plaintiff was claiming that his symptoms were of disabling severity. In that regard the ALJ discussed the hearing testimony of Plaintiff and his mother.   The ALJ further noted that there were medical opinions indicating that Plaintiff was incapable of full-time employment.   And, indeed, the ALJ agreed that Plaintiff's claimed limitations were "somewhat supported by the record." Tr. 21.   However, the ALJ found that Plaintiff's claimed limitations, and the opinions of the medical sources who indicated that Plaintiff was incapable of working, were not entirely consistent with the record overall or persuasive.   On this point, the ALJ cited and discussed evidence purportedly showing that Plaintiff was less limited than he claimed, including Plaintiff's own written functional report (Exhibit 5E) and his statements to treatment providers about his

activities (Exhibit 5F at pp. 19, 27, 30, 31 & 32)[11]; office notes from treatment providers showing consistently normal mental status examination findings (Exhibits 2F, 5F, 6F, 7F & 16F); and the report of consultative psychologist Brownfeld (Exhibit 9F).

Of particular relevance to this action, at step three of the sequential evaluation, the ALJ found that none of Plaintiff's severe impairments, either singly or in combination, met or medically equaled a listed impairment.   Regarding the mental impairments, the ALJ indicated that he had considered listings 12.02 (neurocognitive disorders), 12.04 (depressive, bipolar and related disorders), 12.06 (anxiety and obsessive-compulsive disorders) and 12.11 (neurodevelopmental disorders) and found that Plaintiff did not satisfy either the "paragraph B" criteria or the "paragraph C" criteria for those listings.   With regard to the paragraph C criteria, the ALJ stated:

> I have also considered whether the "paragraph C" criteria are satisfied.   In this case, the evidence fails to establish the presence of the "paragraph C" criteria. The claimant reported no problems with self-care activities.   The claimant also reported that he is able to perform yard work, can prepare meals, has a driver's license, and can shop for groceries (5E).   Furthermore, the evidence does not reveal the claimant has participated in any work programs or required the use of a job coach or supervisor, received comprehensive 24/7 wrap around mental health services, resided in a halfway house or in another highly supportive living arrangement, attended or been referred to a partial hospitalization program, ever had a psychiatric hospitalization, or required the assistance from mental health workers to meet physical needs.

Tr. 20.

---

[11] Plaintiff mentioned, for example, his relationship with his girlfriend; that he was implementing coping skills which he found helpful; that he had used his father's welding equipment while his father was away in Florida (which would have involved Plaintiff traveling to his father's house); and that he was becoming bored staying at home and looked forward to going to group substance abuse therapy and keeping busy to reduce anxiety.

In this action, Plaintiff contends that the Commissioner's decision denying benefits must be reversed since the ALJ's determination at step three of the sequential evaluation, concerning Plaintiff's mental impairments, is erroneous and not supported by substantial evidence. Specifically, Plaintiff contends that the ALJ erred in finding that Plaintiff did not satisfy the paragraph C criteria with regard to Listings 12.02, 12.04 and 12.06, since his analysis "contains several factual errors and was not based on substantial evidence."[12]

Defendant disputes Plaintiff's arguments and maintains that the ALJ's decision is free of reversible legal error and supported by substantial evidence.

The Court has carefully reviewed and considered the parties' submissions.

DISCUSSION

<u>The ALJ's Analysis of the Paragraph C Criteria at Step Three</u>
<u>of the Sequential Evaluation</u>

As just mentioned, "Plaintiff argues that the ALJ's evaluation of the 'paragraph C' criteria contains several factual errors and was not based on substantial evidence, which requires remand."[13]   Plaintiff is claiming, in this regard, that he meets the requirements for listings 12.02, 12.04 and/or 12.06 by satisfying both the paragraph A criteria and the paragraph C criteria.[14] The parties do not dispute that Plaintiff meets the paragraph A criteria, rather, the issue is only with regard to paragraph C.   On this point, Plaintiff states:

"The criterion in C1 is satisfied when the evidence shows that you rely, on an ongoing basis, upon medical treatment, mental health therapy, psychosocial

---

[12] ECF No. 16-1 at p. 23.
[13] ECF no. 16-1 at p. 23.
[14] Those listings may be satisfied by meeting the requirements of either paragraphs A and B or paragraphs A and C.   Plaintiff does not argue here that he meets the requirements of paragraph B.

> support(s), or a highly structured setting(s), to diminish the symptoms and signs of your mental disorder." *Id*. at §12.00(G)(2)(b). "The criterion in C2 is satisfied when the evidence shows that, despite your diminished symptoms and signs, you have achieved only marginal adjustment" (*i.e.* fragile adaptation to the requirements of daily life, minimal capacity to adapt to changes in environment or to demands that are not already part of daily life). *Id*. at §12.00(G)(2)(c).

ECF No. 16-1 at p. 23.   Plaintiff maintains that he satisfies paragraph C1 since throughout the relevant period he received ongoing mental health therapy that diminished the symptoms and signs of his mental disorders.   Plaintiff contends that he also satisfies paragraph C2, since, despite such therapy, he is unable to adapt to changes, as shown by the fact that he essentially needs his mother to take care of him and remind him to take medications, and that despite her efforts he still has poor personal hygiene.[15]   Plaintiff alleges that, to the extent the ALJ found that Plaintiff is capable of adapting to changes, the ALJ overlooked or "distorted evidence," such as by ignoring Plaintiff's hearing testimony about needing his mother to prompt him to perform self-care activities.   Plaintiff also contends that the ALJ overstated the extent to which he is capable of independently performing tasks such as cooking, driving, shopping and performing yard work.   Alternatively, Plaintiff alleges that the ALJ erred by failing to adequately discuss the conflicting evidence that he considered when making his finding regarding the paragraph C criteria.

In response, Defendant does not dispute that Plaintiff satisfies the paragraph C1 criteria.[16]   However, Defendant maintains that the ALJ properly found that Plaintiff did not meet the paragraph C2 criteria, since Plaintiff did not demonstrate that he has only "marginal adjustment."

---

[15] Plaintiff's mother indicates, for example, that Plaintiff may go days without changing his clothes.   However, the Court recalls that somewhere in the record, Plaintiff explains away his hygiene practices by indicating that he and his mother simply have different standards of cleanliness.

[16] ECF No. 19-1 at p. 10.

More specifically, Defendant contends that Plaintiff cannot show "marginal adjustment" where, as here, the record indicates that he could independently perform a wide range of activities. *See*, Def. Memo of Law, ECF No. 19-1 at p. 14 ("[A]s the ALJ discussed, Plaintiff independently performed a wide range of activities despite receiving some assistance from family, and therefore did not demonstrate marginal adjustment or satisfy the paragraph C criteria."). Defendant further contends that the ALJ adequately discussed the evidence that he relied on in making his determination regarding the paragraph C criteria.  Defendant points out, in this regard, that the ALJ was not required to credit the hearing testimony of Plaintiff's mother, which contradicted the statements in Plaintiff's functional report indicating that Plaintiff was capable of independently performing all self-care activities. *Id*.at 15 ("[T]he testimony provided by Plaintiff's mother directly contradicts her 2018 report that Plaintiff had no problems with personal care, did not need special help or reminders to take care of personal needs and grooming, completed yard work and small repair projects, counted change, went shopping in grocery stores and went out alone.").  Defendant also notes that the ALJ's paragraph C finding is supported by the opinion of a state-agency review physician who concluded that the evidence did not establish the paragraph C criteria.

Regarding the precise issue raised by Plaintiff the applicable legal principles have been stated as follows:

Paragraph C . . . requires that:

Your mental disorder in this listing category is "serious and persistent;" that is, you have a medically documented history of the existence of the disorder over a period of at least 2 years, and there is evidence of both:

16

1. Medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of your mental disorder (*see* 12.00G2b); and

2. Marginal adjustment, that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life (*see* 12.00G2c).

*Id*. §§ 12.04.C, 12.06.C. The regulations clarify that the criterion in Paragraph C1 is met, in relevant part:

when the evidence shows that you rely, on an ongoing basis, upon medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s), to diminish the symptoms and signs of your mental disorder (see 12.00D). We consider that you receive ongoing medical treatment when the medical evidence establishes that you obtain medical treatment with a frequency consistent with accepted medical practice for the type of treatment or evaluation required for your medical condition.

*Id*. § 12.00G.2.b. The regulations clarify that the Paragraph C2 criterion is met:

when the evidence shows that, despite your diminished symptoms and signs, you have achieved only marginal adjustment. "Marginal adjustment" means that your adaptation to the requirements of daily life is fragile; that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life. We will consider that you have achieved only marginal adjustment when the evidence shows that changes or increased demands have led to exacerbation of your symptoms and signs and to deterioration in your functioning; for example, you have become unable to function outside of your home or a more restrictive setting, without substantial psychosocial supports (see 12.00D). Such deterioration may have necessitated a significant change in medication or other treatment. Similarly, because of the nature of your mental disorder, evidence may document episodes of deterioration that have required you to be hospitalized or absent from work, making it difficult for you to sustain work activity over time.

*Id*. § 12.00G.2.c. The regulations include examples of psychosocial supports, such as the help of family members who aid a claimant in his or her basic functioning and daily activities, participation in programs that provide instruction in entry-level work skills and daily living, the receipt of "comprehensive '24/7 wrap-around'

mental health services," residence in a hospital or institution that provides 24-hour care, and receipt of "assistance from a crisis response team, social workers, or community mental health workers" who help the claimant with his or her physical needs. *Id*. § 12.00D.1. The regulations also recognize that a claimant can meet this standard if he lives alone and does not receive psychosocial supports but has instead "created a highly structured environment by eliminating all but minimally necessary contact with the world outside [his] living space." *Id*. "Courts in this Circuit routinely have found that no reasonable fact finder could conclude that a plaintiff could meet this standard when, *inter alia*, the plaintiff functioned mostly independently, including by shopping, going online, traveling independently and managing money, and was observed to have goal-directed thoughts." *Campbell v. Comm'r of Soc. Sec.*, No. 1:19-CV-03215 (SDA), 2020 WL 5641200, at *12 (S.D.N.Y. Sept. 22, 2020) (citing cases).

*Gibson v. Saul*, No. 3:20-CV-00145 (KAD), 2021 WL 371577, at *4–5 (D. Conn. Feb. 3, 2021).

Moreover, an ALJ is not required to provide a lengthy discussion of the reasons for his step three finding:

[A]n ALJ is not required to "articulate specific evidence supporting his or her finding that [a claimant's] impairment[ ] does not medically equal a listed impairment." *See* SSR 17-2p, 2017 WL 3928306 at *4. Rather, "a statement that the [claimant's] impairment[ ] does not medically equal a listed impairment" will generally constitute sufficient articulation for the ALJ's finding. *Id*. The ALJ's articulation of the reasons for her conclusion that the claimant is not disabled in the remaining steps of the sequential evaluation should "provide [a] rationale that is sufficient for a subsequent reviewer or court to determine the basis" for the step-three medical equivalence conclusion. *Id*.

*John H. v. Comm'r of Soc. Sec.*, No. 20-CV-1278MWP, 2022 WL 748237, at *6 (W.D.N.Y. Mar. 11, 2022).

Here, the Court finds that the ALJ's finding regarding the paragraph C criteria was not erroneous and is supported by substantial evidence.   More specifically, the finding is supported by Exhibit 5E, Plaintiff's functional report dated April 10, 2018, discussed above, which the ALJ

18

cited. Tr. 20.   In the functional report, Plaintiff indicated that he is able to perform all personal care activities without assistance or reminders, cook, perform yard work, perform small repair jobs, drive a car,[17] shop for groceries once every other week, travel to substance abuse treatment and go out with a girlfriend.[18]   Plaintiff's ability to perform these activities shows that he achieved more than marginal adjustment from his ongoing treatment.   To the extent that Plaintiff and his mother testified at the hearing that Plaintiff was more seriously limited than what was stated in the functional report, the ALJ was not required to credit such testimony.

## CONCLUSION

For the reasons discussed above, Plaintiff's motion for judgment on the pleadings (ECF No. 16) is denied and Defendant's cross-motion for the same relief (ECF No. 19) is granted. The Clerk of the Court is directed to enter judgment for Defendant and to close this action.

So Ordered.

Dated: Rochester, New York
      March 31, 2022

ENTER:

CHARLES J. SIRAGUSA
United States District Judge

---

[17]  Plaintiff reportedly told therapist Burke that he only felt safe leaving his house in the middle of the night, Tr. 938, which, if true, provides further evidence of Plaintiff's independence since there is no indication that his mother would accompany him on such excursions. Tr. 938.

[18]  The record indicates that this relationship lasted at least three years and was sexual in nature. Tr. 453.   Exhibit 5F contains many additional notations regarding this relationship.   In the functional report, Plaintiff indicated that he had stopped seeing his girlfriend, Tr. 260, but not because of his mental limitations.   Rather, a treatment note implied that Plaintiff broke up with her because she changed after she started using drugs. Tr. 491.